IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CAROL L. ROSE,<br><br>                    Plaintiff,<br><br>vs.<br><br>JO ANNE BARNHART, in her capacity as Commissioner of the Social Security Administration,<br><br>                    Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br><br>Case No. 2:06-cv-190 |

Plaintiff Carol L. Rose seeks judicial review under 42 U.S.C. § 405(g) of the final decision by the Commissioner of the Social Security Administration which denied her application for Social Security Income. Ms. Rose contends the court should reverse or modify the Commissioner's decision because the Administrative Law Judge Kathleen H. Switzer ("the ALJ"): (1) wrongfully disregarded the treating physician's opinions; and (2) erred in steps two, three, four, and five of the five-step sequential evaluation process.

The ALJ concluded that the treating physician did not merit controlling weight, but she failed to explain what weight she afforded to the treating physician's opinions. Consequently, the ALJ's decision is insufficient for the court to review and the case is remanded to the ALJ for reconsideration in light of this decision.

BACKGROUND

**Ms. Rose's Relevant Medical History**

After a long struggle with alcoholism, Ms. Rose suffered several physical problems in early 2003. She was admitted to the hospital for gastrointestinal bleed, ascites, alcoholic hepatitis and hypokalemia in January of 2003. (R. 190-91, 193.) Placed on dialysis, much of Ms. Rose's renal functioning improved. (R. 257, 262.)

On April 28, 2003, Dr. Gerald Stephanz noted significant improvement, such as "recovered function" from her acute renal failure, her hepatic encephalopthy was "now resolving," her weakness and deconditioning were "improving," and her history of GI was "stable." (R. 311.) Accordingly, in a letter dated June 12, 2003, Dr. Stephanz concluded dialysis was no longer necessary. (R. 308.)

On that same date, June 12, 2003, Ms. Rose filed this claim for Social Security Income, claiming that she had been disabled since January 15, 2003. (R. 57.)

Dr. Terry Hammond, an associate of Dr. Stephanz, examined Ms. Rose later that month. Reiterating much of Dr. Stephanz's positive prognosis, Dr. Hammond noted that "clinically she is doing well." (R . 298.) Nonetheless, he concluded Ms. Rose was "still unable to work, as it does cause her quite a bit of pain to be on her feet much." (Id.) Concerned about Ms. Rose's "numbness and pain [which] is bilateral from the knees down," Dr. Hammond raised a "[q]uestion of neuropathy in the bilateral lower extremities." (R. 299, 300.) Although he observed Ms. Rose "denies any numbness in any of her upper extremities," he recommended "a neurology consultation regarding this neuropathy." (Id.)

Accordingly, Dr. Stephanz referred the case to neurologist Dr. Lucia Scott de Altamirano.

(R. 321, 324.)  In an initial evaluation on July 11, 2003, Dr. Altamirano noted that Ms. Rose exhibited normal gait and station and 4/5 strength in her legs.  (R. 325.)  Believing Ms. Rose may have peripheral neuropathy, Dr. Altamirano ordered a nerve conduction study on Ms. Rose's lower extremities.  (R. 326.)  One week later, Dr. Altamirano concluded Ms. Rose had peripheral neuropathy.  (R. 321.)

On July 28, 2003, Dr. Stephanz saw Ms. Rose again.  (R. 306.)  He reported Ms. Rose's acute renal failure had resolved, her mild hypertension was controlled, her anemia was improving despite high ferritin, and her alcoholic hepatitis improved.  (Id.)  But he also noted Ms. Rose "still has significant neuropathy" even though she was "gaining strength" and medication appeared to be helping.  (Id.)

Dr. Altamirano, along with physician's assistant Konneen Willis, continued to see Ms. Rose regularly for her neuropathy.  (R. 317-23.)  The numbness became so severe that Ms. Rose was unaware she fractured her ankle in March of 20004, until it was discovered weeks later during a medical appointment.  (R. 353, 363, 374, 416.)  Also, notes from monthly appointments with Dr. Altamirano and Ms. Willis between January and April of 2005, show Ms. Rose's gait and station fell within normal limits, the tone and bulk of her muscles were normal, and the strength of her upper and lower extremities oscillated between 3/5 and 4/5.  (R. 348-51.)  The notes also show Ms. Rose complained of pain and swelling in her wrists and hands at each of those meetings, and by April, "[w]riting ha[d] become difficult" for Ms. Rose.  (R. 348.)  Dr. Altamirano concluded "[b]ecause of Severe Peripheral Neuropathy, Chronic Pain, and swelling of her joints[,] she is unable to perform gainful employment.  This condition is PERMANENT."  (Id.)

**The Commissioner Denied Ms. Rose's Application**

On May 5, 2005, Ms. Rose appeared and testified at a hearing before the ALJ to determine whether she qualified as disabled under Section 1614(a)(3)(A) of the Social Security Act ("the Act"). (R. 13.) Before the hearing, the physician's assistant Ms. Willis filled out a Physical Residual Functional Capacity Questionnaire, dated February 7, 2005. (R. 360-63.) The questionnaire stated that Ms. Rose's lower strength was "3/5" and her upper strength was "4/5." (Id.) Ms. Willis also indicated that Ms. Rose could not walk a single city block without rest or severe pain, she could sit no longer than one hour at a time, she could stand no longer than one hour at a time, she could not sit or stand longer than two hours in an eight-hour work day, she could lift less than ten pounds, and she could not use her hands, fingers, or arms more than 25% of an eight-hour work day. (Id.)

Nonetheless, on May 24, 2005, the ALJ "conclude[d] the claimant is not disabled within the meaning of the Social Security Act." (R. 13.) Applying the five-step sequential analysis, the ALJ denied Ms. Rose's claim. (R. 14.). The Tenth Circuit has outlined the five-step sequential analysis:

> (1) [T]he claimant is presently engaged in substantial gainful activity, (2) the claimant has a medically severe impairment or impairments, (3) the impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation, (4) the impairment prevents the claimant from performing his or her past work, and (5) the claimant possesses a residual functional capability (RFC) to perform other work in the national economy, considering his or her age, education, and work experience.

Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir. 2004) (citing 20 C.F.R. § 404.1520(a)(4)) (footnote omitted).

The ALJ ruled that Ms. Rose satisfied each of the first two steps. (R. 14-15.) Ms. Rose

satisfied step one because she "has not engaged in substantial gainful activity since her alleged onset date." (R. 14.) And to satisfy step two, the ALJ found Ms. Rose "has the following 'severe' impairments: history of alcoholic hepatitis and hepatic encephalopathy; history of acute renal failure from acute and chronic alcohol use; bilateral neuropathy lower extremities; and alcoholism." (R. 15.) Notably absent from the ALJ's list of impairments is any mention of neuropathy in Ms. Rose's upper extremities.

But Ms. Rose did not satisfy step three because these impairments were "not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (Id.) Specifically, the ALJ determined that the impairments did not qualify under listing 11.14 of the appendix,[1] which requires a "disorganization of motor function as described in 11.04B, in spite of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14. Under 11.04B, Ms. Rose must prove "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."[2] Id. § 11.04B.

---

[1] The ALJ also concluded that Ms. Rose did not satisfy listing 12.09 of the appendix, which provides for disabilities based on substance addiction disorders. (R. 15.) See 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.09. Because Ms. Rose has not appealed this conclusion, the court will not review the ALJ's determination.

[2] 11.04B references 11.00C, which requires:
> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.04B.

Although the ALJ concluded "[t]he record demonstrates that [Ms. Rose] has peripheral neuropathy," she determined Ms. Rose did not satisfy the 11.04B standard. (R. 15.) Instead, the ALJ found "no evidence that the claimant's disorganization of motor function is so severe as to satisfy the requirements of a listed impairment." (Id.) As support, she noted that "Dr. Altamirano consistently found normal gait and station." (Id.) (citing R. 348-63).

Failing step three sent the analysis to step four. The ALJ ruled the Act barred Ms. Rose's claim because her impairment did not prevent her from doing past relevant work. (R. 20-21.) Alternatively, the ALJ also ruled Ms. Rose failed step five because she "is capable of making a successful adjustment to work that exists in significant numbers in the national economy." (R. 22.) The ALJ denied her claim, finding Ms. Rose "was not under a 'disability,' as defined in the Social Security Act." (R. 23.)

Almost two months after the ALJ rejected Ms. Rose's claim, Dr. Altamirano filled out a Physical Residual Functional Capacity Questionnaire. (R. 371-74.) The conclusions from Dr. Altamirano's questionnaire were virtually identical to those in Willis's questionnaire. (R. 360-63, 371-74.) Dr. Altamirano reported Ms. Rose could not sit or stand longer than two hours in an eight-hour work day and that Ms. Rose could not use her hands, fingers, or arms for more than 25% of eight-hour work day. (R. 371-74.) On January 3, 2006, the Appeals Council formally added Dr. Altamirano's questionnaire to the record. (R. 8.)

Despite this additional report, the Appeals Council "found no reason to review the Administrative Law Judge's decision." (R. 5.) In denying review, the council apparently found Dr. Altamirano's questionnaire not "contrary to the weight of all the evidence now in the record."

(Id.)  With this determination, the ALJ's ruling became the final decision of the Commissioner. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) ("The Appeals Council denied claimant's request for review and, accordingly, the ALJ's decision became the final decision of the Secretary.").

On March 3, 2006, Ms. Rose filed a timely request for judicial review with this court.

STANDARD OF REVIEW

When reviewing the Commissioner's decision, the court may consider only whether the substantial evidence supports the decision and whether the Commissioner applied the correct legal standards.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 1003) ("We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.").  "Substantial evidence is more than a scintilla; it is such relevant evidence as a reasonable mind might deem adequate to support a conclusion."  Jordan v. Heckler, 835 F.2d 1314, 1316 (10th Cir. 1987). When evaluating the evidence, "'[t]he court may not reweigh the evidence or try the issues de novo or substitute its judgment for that of the Secretary.'"  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992) (quoting Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir. 1989)).  But the standard demands "we meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  Grogan v. Barnhart, 399 F.3d 1257, (10th Cir. 2005)

Given this standard of review, the Tenth Circuit requires "'the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.'"  Id. (quoting Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996)).  It is

incumbent upon "the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence."  Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996).

## ANALYSIS

Ms. Rose has requested this court reverse or modify the Commissioner's decision because the ALJ: (A) did not afford controlling weight to Dr. Altamirano's opinions; and (B) erred in steps two through five of the five-step analysis.

**A.      Weight Afforded Dr. Altamirano's Opinions**

Because the ALJ did not properly discuss the weight given to the treating physician's opinions, the court cannot determine if she applied the correct legal standards or if her decision accords with the substantial evidence.  Whether the substantial evidence supports the ALJ's conclusion depends largely on the weight afforded Dr. Altamirano's opinions.  Even if the ALJ correctly ruled that Dr. Altamirano's opinions do not merit controlling weight, she still must explain what weight she afforded Dr. Altamirano's opinions.

A treating physician's opinion on the nature and severity of an impairment should receive controlling weight if it is supported by acceptable medical techniques and it is not inconsistent with the rest of the evidence. 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").  Such deference is justified because the treating physician is "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)."  Id.

But as the Social Security Administration has explained, "finding that a treating source's

medical opinion is not entitled to controlling weight does not mean that the opinion is rejected." Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *1. Rather, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." Id. at *4. The Tenth Circuit reinforced this notion, explaining even if the treating physician "was not entitled to controlling weight, the ALJ was not entitled to completely reject his opinion on this basis alone; rather, he was obligated to consider what lesser weight the opinion should be given, using all of the relevant factors set forth in sections 404.1527 and 416.927." Victory v. Barnhart, 121 Fed. Appx. 819, 824 (10th Cir. 2005). In such cases, the ALJ must "'make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight.'" Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003)).

Accordingly, particular factors must be used to determine the weight a treating physician's opinion receives. See 20 C.F.R. 404.1527(d). The ALJ must address the "[l]ength of the treatment relationship and the frequency of examination" and the "[n]ature and extent of the treatment relationship." 20 C.F.R. 404.1527(d)(2)(i)-(ii). The ALJ should also consider if the treating physician had a relevant speciality. 20 C.F.R. 404.1527(d)(5). Finally, the ALJ should also consider any factors:

> [W]hich tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case . . . .

20 C.F.R. 404.1527(d)(6).

Here, the ALJ determined that Dr. Altamirano's opinions did not merit controlling weight because her opinions were "inconsistent with the medical evidence." (R. 20.) Specifically, Dr. Altamirano's opinions, which spanned from 2003 to 2005, differed from the September 12, 2003 State agency's report. (Id.) ("Dr. de Altamirano's opinion is inconsistent with the physicians of the opinions at the State agency (Exhibit 11F).").

Even if an evaluation conducted in 2003 sufficiently contradicts Dr. Altamirano's opinions to deny them controlling weight—which the court is not prepared to conclude—the ALJ must still explain what weight she afforded those opinions. Unless the ALJ adheres to the particular factors, a court cannot determine whether she applied the correct legal standards in evaluating the treating physician's opinions. Robinson, 366 F.3d at 1083 ("Because the ALJ failed to provide any explanation of how he assessed the weight of the treating physician's opinion, as required by Soc. Sec. R. 96-2p, '[w]e cannot simply presume the ALJ applied the correct legal standards in considering [the treating physician's] opinion.'") (quoting Watkins, 350 F.3d at 1301).

But the ALJ did not explain what weight she afforded Dr. Altamirano's opinions, nor did she walk through the factors enumerated in 20 C.F.R. 404.1527(d). Because the ALJ did not provide any discussion of the frequency that Dr. Altamirano saw Ms. Rose, the fact that Dr. Altamirano was the only neurologist on record, or any other factors which may be relevant, it is unclear if Dr. Altamirano's opinions were appropriately considered. (See R. 20.) Without this necessary analysis, the court cannot determine whether the ALJ applied the correct legal standards or whether her conclusions align with the substantial evidence. The court must remand the case. See Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003) ("We must remand

because we cannot meaningfully review the ALJ's determination absent findings explaining the weight assigned to the treating physician's opinion.").

**B.    The Five-Step Analysis**

**Steps Two and Three of the Analysis**

Ms. Rose also seeks judicial review because the ALJ did not consider Ms. Rose's upper neuropathy at step two, and this may have affected her findings in step three. But the ALJ did not adequately discuss Dr. Altamirano's opinions, so the court cannot determine if her findings at steps two and three were proper.

Although there is evidence on the record that Ms. Rose suffered from neuropathy in her upper extremities, the ALJ does not include upper neuropathy among Ms. Rose's impairments at step two. (R. 15.) See, e.g., (R. 348.) ("[P]atient comes in today with complaints of swelling in her wrists and pain in her wrists and hands . . . Strength: 4/5 lower extremities, 3/5 upper extremities except for grip which unable to assess due to pain"); (R. 349.) ("Patient comes in today with swollen wrists. She complains of pain and stiffness in wrists . . . Strength: 3/5 grasp but painful."). It appears the ALJ disregarded this information in part because she concluded Dr. Altamirano did not merit controlling weight. As discussed above, the ALJ must explain what weight she affords the treating physician and the reasons for that weight. See Robinson, 366 F.3d at 1082. Because the ALJ did not explain what weight she afforded Dr. Altamirano's opinions, she must develop her analysis of step two more thoroughly on remand.

Additionally, the ALJ found "no evidence" Ms. Rose's impairments were severe enough

to satisfy step three.[3] She bases this conclusion largely on Dr. Altamirano's notes that Ms. Rose's gait and station fell within normal limits. (R. 15.) ("Dr. Altamirano consistently found normal gait and station."). But the ALJ did not discuss all of Dr. Altamirano's opinions. The Tenth Circuit has clearly stated an "ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." Robinson, 366 F.3d at 1083. Nonetheless, the ALJ disregarded several of Dr. Altamirano's opinions, while considering those notes which support a finding of nondisability. On remand, the ALJ must address all of the treating physician's opinions, and describe the weight afforded to those opinions.

Furthermore, the ALJ's finding "no evidence" that Ms. Rose satisfied step three is no longer consistent with the record. (R. 8, 371-74.) On January 3, 2006, the Appeals Council formally added Dr. Altamirano's July 21, 2005 questionnaire to the record. Although this questionnaire came after the ALJ issued her ruling, there is now at least some evidence Ms. Rose satisfied step three. Dr. Altamirano's questionnaire is particularly relevant after the ALJ disregarded Ms. Willis's similar questionnaire because she is not a physician. (R. 20.) In light of the compelling nature of Dr. Altamirano's questionnaire, it is incumbent upon the ALJ to consider this evidence on remand and explain exactly what weight it carries.

**Steps Four and Five of the Analysis**

Because Dr. Altamirano's opinions and questionnaire may affect the ALJ's analysis of

---

[3]Ms. Rose also seeks judicial review over the of the ALJ's refusing to allow her to cross-examine the medical expert on the issue of whether Ms. Rose had a listing-level impairment. But the ALJ explained that the expert was a psychologist and not a medical doctor, (R. 426.), so Ms. Rose's contention is not well founded.

steps four and five on remand, the court will not address Ms. Rose's contentions at this time.

## ORDER

For the foregoing reasons, the case is REMANDED to the ALJ for reconsideration of the evidence in this matter consistent with this order.

DATED this 21st day of February, 2007.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge